# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **LINDA HUGHES,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. _____ |
| | § | |
| **LIFE INSURANCE COMPANY OF NORTH AMERICA,** | § | |
| | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Linda Hughes ("Plaintiff" or "Hughes") files this Original Complaint against Life Insurance Company of North America ("LINA").

### A.   PARTIES

1. Plaintiff, Linda Hughes, is an individual who is a citizen and resident of Bexar County, Texas.

2. LINA is an insurance company incorporated under the laws of the State of Pennsylvania with its principal place of business also in Pennsylvania.  LINA can be served with citation by serving its Attorney for Service, C T Corporation System, by certified mail, return receipt requested, at 350 North St. Paul St., Dallas, TX 75201.

### B.   JURISDICTION

3. The Court has jurisdiction over the lawsuit under 28 U.S.C. § 1332(a)(1) because Plaintiff and Defendant are citizens of different U.S. states and the amount in controversy exceeds $75,000 excluding interest and costs.

### C. VENUE

4. Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this claim occurred in this district.

### D. CONDITIONS PRECEDENT

5. All conditions precedent to recovery have been performed, waived, or have occurred.

### E. FACTUAL BACKGROUND

6. Hughes was employed as a home health registered nurse—a medium duty occupation—by Mercy Home Care in Toledo, Ohio. While she was employed there, it was owned and operated by Catholic Health Partners, a not-for-profit healthcare system operated by the Catholic church. Catholic Health Partners changed its name to Mercy Health in 2014, but is still operated and/or affiliated with the Catholic church.

7. While employed by Mercy, Hughes enrolled in a group long-term disability insurance plan (the "Plan") established and maintained by Catholic Health Partners for its active employees. The Plan was insured by a group policy issued by LINA, which also administered the Plan. Because the Plan was established and maintained by the Catholic church, it is exempt from ERISA. 29 U.S.C. §§ 1002(33), 1003(b)(2).

8. The Plan provided the following definition of "Disabled" for the first 24 months of the payment of LTD benefits:

> The Employee is considered Disabled if, solely because of Injury or Sickness, he or she is:
>
> 1. unable to perform the material duties of his or her Regular Occupation; and
> 2. unable to earn 80% or more of his or her Indexed Earnings from working in his or her Regular Occupation.

Case 5:17-cv-00574-FB-HJB   Document 1   Filed 06/28/17   Page 3 of 15


9. After the payment of 24 months of LTD benefits, the Plan changed the definition of Disabled to apply to "any occupation" rather than a claimant's "Regular Occupation:"

> After Disability Benefits have been payable for 24 months, the Employee is considered Disabled if, solely due to Injury or Sickness, he or she is:
>
> 1. unable to perform the material duties of any occupation for which he or she is, or may reasonably become, qualified based on education, training or experience; and
> 2. unable to earn 60% or more of his or her Indexed Earnings.

10. Hughes ceased working for Mercy on September 18, 2013 as a result of arthralgia in her right knee, sacroiliitis, chronic lumbar pain caused by a protruding disc, chronic obstructive pulmonary disease ("COPD"), metabolic syndrome with arherogenic dyslipidemia, and congestive heart failure. As a result of these diagnoses, she had various impairing symptoms, including, but not limited to, severe right knee pain, severe lower back pain that radiated down her right leg to her toes that was not improved with various pain management treatments including facet blocks and steroid injections, and chronic fatigue. Due to these symptoms, she not only stopped working, but was forced to hire helpers to assist her with her activities of daily living, including, but not limited to, housekeeping and grocery shopping.

11. In addition, as a result of the arthralgia in her right knee, she underwent a total right knee arthroplasty on September 23, 2013. Due to post-operative complications, on November 19, 2013, she underwent subsequent manipulation of her right knee under anesthesia. After her surgeries, she underwent physical therapy for her knee for several weeks.

12. Hughes applied for and received short-term disability benefits from LINA from November 17, 2013 to March 18, 2014. Before those benefits expired, LINA considered her eligibility for LTD benefits. On April 8, 2014, LINA approved her claim for LTD benefits effective March 19, 2014. Prior to LINA's approval of her LTD claim, the Social Security

Administration concluded Hughes became disabled—*i.e.,* unable to engage in any substantial gainful activity by reason of any medically determinable physical impairment which can be expected to last for a continuous period of not less than 12 months—as of September 18, 2013 and began issuing her monthly payments.

13. In the summer of 2014, while LINA continued to pay Hughes her LTD benefits, she moved to San Antonio, Texas.

14. In March 2015, LINA started an investigation to determine whether Hughes would meet the "any occupation" definition of "Disabled" under the Plan effective March 17, 2016, the date on which LINA would have paid Plaintiff 24 months of LTD benefits. As part of its investigation, LINA initially sought her updated medical records.

15. LINA obtained Plaintiff's medical records from Dr. David Hirsch, Plaintiff's pain management doctor, Dr. Jennifer Retzloff, Plaintiff's primary physician, Dr. David Marks, Plaintiff's pulmonologist, and Dr. John Canales, Plaintiff's cardiologist.

16. Plaintiff's various medical records from her treating physicians revealed her current diagnoses were multi-level degenerative disc disease with bulging discs and Tarlov's cysts; coronary artery disease; COPD; IgA/IgG deficiency or immune deficiency that caused Plaintiff to have chronic bronchitis, gastrointestinal problems, and inflammation and pain in her joints; hypothyroidism; and chronic insomnia with night terrors. Upon examination, her treating physicians noted she was walked with a cane due to chronic, severe back pain and she was visibly uncomfortable and in pain. Further, the records showed Hughes continued to receive nerve root blocks and sacroiliac joint injections for her back pain, but they did not ameliorate her severe pain completely. In addition, she was taking a large number of prescribed medications, which included the Flector patch (a topical anti-inflammatory drug for pain relief), Flexeril (a

muscle relaxant to treat pain and stiffness caused by muscle spasms), the lidocaine 5% patch (a local anesthetic used to treat neuralgia and pain), Metoprolol (a beta blocker used to treat high blood pressure, chest pain, and heart failure), Niravam (a sedative used to treat anxiety), Nitroglycerin (used to treat and prevent chest pain caused by heart disease), and Synthroid (used to treat hypothyroidism).

17. LINA also asked all four physicians to complete Physical Ability Assessment ("PAA") forms to identify her physical restrictions and limitations. Dr. Hirsch completed the PAA and concluded that due to Plaintiff's chronic back pain she could only sit on an occasional basis—less than 2 ½ hours in an eight-hour workday—which prevented her from performing a sedentary job. Dr. Marks also opined Hughes could not perform constant sitting. Dr. Canales submitted the PAA form to LINA, but specifically noted he could not comment upon Plaintiff's physical restrictions and limitations outside of the diagnose for which he was treating her—*i.e.*, coronary artery disease. LINA never followed up with Dr. Retzloff regarding its request that she complete the form as well.

18. Instead, LINA subsequently contacted MES Solutions, a well-known third-party vendor that provides biased "independent" medical examinations ("IME") and medical records reviews for disability insurers, to arrange for Hughes to have an IME. MES scheduled Hughes for an IME with Dr. William Jennings on October 8, 2015.

19. Based on his review of only some of Plaintiff's medical records, a brief conversation with Hughes about her medical history, and an even briefer physical examination of her, Dr. Jennings unsurprisingly concluded her physical restrictions and limitations did not prevent her from performing a sedentary level job. Notably, Dr. Jennings did not perform a functional capacity evaluation ("FCE") to determine what her physical restrictions and

5

limitations actually were. In addition, without any medical basis, he concluded the following: Plaintiff's degenerative disc disease and degenerative joint disease of her spine and knees were not severe enough to cause her any significant restrictions and limitations; her heart and lung function were normal; there was absolutely no medical basis to support her diagnosis of IgA/IgG deficiency or immune deficiency; and her prescribed medications caused her no negative side effects.

20. After receiving Dr. Jennings flawed IME report, LINA referred her claim to its vocational department for a Transferable Skills Analysis ("TSA")—*i.e.,* a review to determine whether there were any sedentary occupations she could perform with her education, training, and experience and the physical restrictions and limitations Dr. Jennings outlined in his report. LINA only provided the vocational specialist with the PAA form completed by Dr. Jennings and not the forms completed by Dr. Hirsch and Dr. Marks, who had both concluded Hughes could not engage in the prolonged sitting required of a sedentary occupation. Given the lack of information he was given, the vocational specialist who conducted the TSA predictably concluded there were two sedentary level occupations Hughes could perform.

21. Based solely on the IME report and the TSA, LINA notified Hughes on October 22, 2015 that it would stop paying her LTD benefits effective March 17, 2016—the date on which she would have received 24 months of benefit payments and the definition of "Disabled" would change under the Plan.

22. Hughes appealed LINA's decision on May 27, 2016. As part of her appeal, she submitted the results of a FCE she underwent on May 25, 2016, an April 29, 2016 letter authored by Dr. Hirsch supporting her disability, and updated medical records from her office visits with

her various treating physicians, including, but not limited to, those from her office visits with Dr. Hirsch, Dr. Anna Sanchez, a podiatrist, and Dr. John Chance, an orthopedic surgeon.

23. Dr. Marcus Hayes, who performed the FCE, concluded in his report that Hughes could not perform a sedentary physical demand level occupation because she could only infrequently sit, walk, and stand during an 8-hour workday and she could never lift, carry, push or pull objects weighing up to 10 pounds due to a lack of range of motion, pain, and lack of neuromuscular balance.

24. In his April 19, 2016 letter supporting Plaintiff's disability, Dr. Hirsch opined she did not have the physical capability to perform a sedentary occupation because she could not sit for more than a few hours in total during an eight-hour workday nor stand or walk on an occasional basis. He based these conclusions on Plaintiff's various diagnoses relating to her chronic lower back and left knee pain and his findings upon examination that she had limited range of motion in lateral side bending and rotation of the lumbosacral spine, SI joint and facet joint tenderness, and central spinous process tenderness without a straight leg raise.

25. Plaintiff's updated medical records from Dr. Hirsch showed her diagnoses to be lumbar radiculopathy, lower back pain, spinal stenosis of the lumbar region, left knee joint pain, and myofascial pain and revealed she was still suffering from chronic lower back pain radiating down the front of her right thigh and the side of her calf, numbness in her right thigh, and increased pain upon prolonged sitting, standing and walking that was only alleviated if she lied down. The records also showed she frequently received lumbar medial block injections, lumbar radiofrequency, and trigger point injections for her lower back pain, but despite those treatments she was still suffering from severe pain.

26. Plaintiff's records from Dr. Chance showed she had limited range of motion and

7

1+ instability in her left knee with varus vaigus testing. X-rays of her left knee revealed advanced bone-on-bone degenerative changes affecting the lateral compartment and a MRI showed bone-on-bone articulation laterally. Dr. Chance gave Hughes a steroid injection in her left knee and recommended she consider undergoing surgery for a full left knee replacement (she previously underwent right knee replacement surgery in September 2013 immediately after she ceased working).

27. Plaintiff's records from her visits with Dr. Anna Sanchez show she sought treatment for and an evaluation of severe pain she was experiencing in both feet resulting in an extreme difficulty walking. Dr. Sanchez sent Hughes for a MRI of both feet that showed she had fractures in both feet, a fracture of the head of her tibia on the left leg, tendonitis of the left Achilles tendon, plantar fasciitis of the left foot, and a synovial cyst in her left foot. As a result of the MRI findings, on May 12, 2016, Dr. Sanchez prescribed her an orthopedic walking boot for her left leg that she had to wear for several months.

28. After receiving Plaintiff's appeal, LINA referred her claim for a medical records review by a physician board certified in preventative and occupational medicine, not in orthopedics or pain management. The reviewing physician only reviewed her medical records and did not talk to, much less examine, her, or speak to her treating physicians. He concluded based on Plaintiff's diagnoses of spinal stenosis, degenerative disc disease, facet arthopathy, and left knee osteoarthritis, that she had the following physical restrictions and limitations: sitting for only 30 minutes at a time, followed by a 10-minute break from sitting, for a total of six hours of an eight-hour workday; walking and standing for only 10 minutes at a time for up to two hours a day; and lifting, carrying, pushing and pulling up to 10 pounds a day frequently and up to 20 pounds a day occasionally.

29. After receiving the reviewing physician's report, LINA again referred Plaintiff's claim to a vocational specialist to perform another TSA. LINA only provided the vocational specialist with the reviewing physician's stated restrictions and limitations for Hughes and yet again failed to provide the specialist with Dr. Hirsch's letter outlining the physical restrictions and limitations he believed Hughes had based on his frequent physical examinations of her. Thus, unsurprisingly, the vocational specialist concluded she could perform the same two jobs identified by the specialist in the previous TSA report.

30. Based solely on the medical records review and the new TSA, LINA advised Hughes on July 11, 2016 that it had upheld its decision to terminate her LTD benefits effective March 17, 2016.

31. LINA's investigation of Plaintiff's continued eligibility for LTD benefits, its decision to terminate those benefits, and its conclusion that it would uphold that decision on appeal was utterly unreasonable and was unsupported by the great weight of the medical evidence in her claim file and the information that was readily available to it.

32. As a result of LINA's unjustifiable conduct and its wrongful termination of her LTD benefits, Hughes has experienced severe financial distress and mental anguish. In addition, as a result of LINA's wrongful acts and omissions, she was forced to retain the professional services of the attorneys and law firm who are representing her in this case.

### H.    CAUSES OF ACTION
### BREACH OF CONTRACT

33. Hughes incorporates paragraphs 1-32 as if fully set forth herein.

34. According to the LTD Plan, LINA has the duty to pay Hughes monthly LTD benefits as long as she remains "Disabled" under the Plan and submits proof of her disability. She has met these requirements.

35. LINA's termination of Plaintiff's LTD benefits under the Plan and under the laws of the State of Texas, constitutes a breach of LINA's contract with Hughes. As a result of this breach of contract, she is entitled to recover the amount of her past-due LTD benefits under the Plan.

## VIOLATION OF THE PROMPT PAYMENT OF CLAIMS ACT

36. Hughes incorporates paragraphs 1-35 as if fully set forth herein.

37. LINA's acts, omissions, failures and conduct violate Section 542 of the Texas Insurance Code because it failed to pay Plaintiff's monthly LTD benefits within the applicable statutory period. In the event it is determined LINA owes Hughes any monies on her LTD claim, then LINA has automatically violated Section 542 in this case.

## VIOLATIONS OF THE DTPA

38. Hughes incorporates paragraphs 1-37 as if fully set forth herein.

39. Hughes is a consumer of goods and services provided by LINA pursuant to the DTPA. She has met all conditions precedent to bringing this cause of action against LINA.

40. Specifically, LINA's violations of the DTPA include, without limitation, violations of Sections 17.46(b)(12) and (20) and 17.50 (a)(2)-(4) of the DTPA. LINA's violations include, (1) its unreasonable investigation and decision on Plaintiff's LTD claim, (2) its failure to give her the benefit of the doubt, and (3) its failure to continue to pay her monthly LTD benefits for which liability had become reasonably clear.

41. Hughes is entitled to recover under Section 17.46(b)(12) of the DTPA because LINA represented to her that its insurance policy and its adjusting and investigative services conferred or involved rights, remedies, or obligations that it did not have.

42. Hughes is entitled to recover under Section 17.46(b)(12) and (20) and 17.50(a)(2) of the DTPA because LINA has breached an express warranty that she would continue to receive LTD benefits under the Plan as long as she presented evidence she was "Disabled."

43. Hughes is entitled to recover under Section 17.50(a)(3) of the DTPA because LINA's actions were unconscionable in that it took advantage of her lack of knowledge, ability and experience to a grossly unfair degree.

44. Hughes is entitled to recover under Section 17.50(a)(4) of the DTPA because LINA's conduct, acts, omissions, and failures were unfair practices in the business of insurance.

45. All of the above-described acts, omissions and failures of LINA are the producing cause of Plaintiff's damages as described in this complaint. All of the above-described acts, omissions, and failures of LINA were done knowingly and intentionally as those terms are defined in the Texas Deceptive Trade Practices Act.

## VIOLATIONS OF SECTION 541 OF THE TEXAS INSURANCE CODE

46. Hughes incorporates paragraphs 1-45 as if fully set forth herein.

47. Hughes has satisfied all conditions precedent to bring this cause of action.

48. By its acts, omissions, failures and conduct, LINA has engaged in unfair and deceptive acts or practices in the business of insurance in violation of section 541 of the Texas Insurance Code. Such violations include, without limitation, all the conduct described in this complaint, plus LINA's unreasonable delays in the investigation of Plaintiff's claim and its failure to pay her monthly LTD benefits for which liability had become reasonably clear.  They

further include LINA's failure to give her the benefit of the doubt. Specifically, as described in Plaintiff's factual allegations, LINA is guilty of the following unfair insurance practices:

- a. Engaging in false, misleading and deceptive acts or practices in the business of insurance;
- b. Engaging in unfair claims settlement practices;
- c. Misrepresenting to Hughes pertinent facts or policy provisions relating to the coverage at issue;
- d. Not attempting in good faith to effectuate a prompt, fair and equitable settlement of her claim for which liability became reasonably clear;
- e. Refusing to pay her claim without conducting a reasonable investigation with respect to the claim; and
- f. Failing to promptly provide Hughes with a reasonable explanation of the basis in the Plan in relation to the facts or applicable law for the termination of her LTD benefits.

49. LINA also breached the Texas Insurance Code when it breached its duty of good faith and fair dealing.

50. Plaintiff's damages resulted from LINA's conduct.

51. LINA's acts, omissions, and failures were committed knowingly as that term is described in the Texas Insurance Code.

## BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

52. Hughes incorporates paragraphs 1-51 as if fully set forth herein.

53. By its acts, omissions, failure and conduct, LINA has breached its common-law duty of good faith and fair dealing by terminating Plaintiff's LTD benefits without any reasonable basis and by failing to conduct a reasonable investigation to determine whether it had a sufficient basis for the termination of her benefits.

54. LINA has also breached this duty by unreasonably delaying payment of Plaintiff's LTD benefits because it knew or should have known that it was reasonably clear that she was "Disabled" under the Plan. These acts, omissions, failures and conduct of LINA are a proximate cause of Plaintiff's damages.

### I.     WAIVER AND ESTOPPEL

55. LINA has waived and is estopped from asserting any coverage defenses, conditions, exclusions, or exceptions to coverage not contained in any of its denial letters to Hughes.

### J.     DAMAGES

56. As a direct and proximate result of defendant's conduct, Hughes suffered the following injuries and damages:

   a. The amount of her past-due monthly LTD benefits;

   b. An 18% per annum penalty on the amount of her past-due benefits;

   c. Mental anguish;

   d. Loss of credit reputation;

   e. Pre- and post-judgment interest;

   f. In the alternative to (g) and (h), an award of damages for mental anguish in an amount of up to three times economic damages for LINA's knowing violations of the DTPA or an award of up to three times the amount of damages for mental anguish and economic damages for LINA's intentional violations of the DTPA pursuant to Tex. Bus. & Com. Code § 17.50(b)(1);

      g.    In the alternative to (f) and (h), an award of up to three times the amount of actual damages for LINA's knowing violations of the Texas Insurance Code pursuant to Tex. Ins. Code § 541.152(b); and

      h.    In the alternative to (f) and (g), exemplary damages in an amount to be determined by the finder of fact that is sufficient to punish LINA for its intentional and malicious breach of its duty of good faith and fair dealing owed to Gregory pursuant to Chapter 41 of the Tex. Civ. Prac. & Rem. Code;

### K. ATTORNEY'S FEES

57. As a result of LINA's conduct, Hughes has been forced to retain the undersigned attorney to prosecute this action and has agreed to pay reasonable attorney's fees. She is entitled to recover these attorney's fees under Chapter 38 of the Texas Civil Practices and Remedies Code, Sections 541 and 542 of the Texas Insurance Code, and Section 17.50 of the DTPA.

### L. JURY DEMAND

58. Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Hughes demands a trial by jury in this action of all issues so triable.

### M. PRAYER

Plaintiff prays that LINA be cited to appear and answer herein, and that upon trial hereof, that she have and recover such sums as would reasonably and justly compensate her in accordance with the rules of law and procedure, both as to actual damages, consequential damages, statutory damages, equitable relief, mental anguish and/or treble damages under the Texas Insurance Code and Texas Deceptive Trade Practices Act, and all punitive, additional, exemplary damages as may be found. In addition, Plaintiff requests the award of attorney's fees for the trial and any appeal of this case, for all costs of court, for prejudgment and post judgment interest as allowed by law, and for any other and further relief, at law or in equity, to which she may show herself to be justly entitled.

Respectfully Submitted,

**THE LAW OFFICE OF JESSICA TAYLOR**
14100 San Pedro, Suite 602
San Antonio, Texas 78232
(210) 402-4022 (Telephone)
(210) 402-1225  (Fax)


By: /s/ *Jessica Taylor*
    JESSICA TAYLOR
    Texas State Bar No. 24013546
    jessica@jtaylorlaw.com
    MANUEL ACUÑA-NEELY
    Texas State Bar No. 24091489
    manuel@jtaylorlaw.com